IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PENDELTON DIVISION

THOMAS FREDERICK BROWER,                         Case. No. 2:17-cv-00367-AA
                                                 **OPINION & ORDER**
             Plaintiff,

W. POWELL; J. DUCHEK; AND JOHN
DOES 1–10,

             Defendants.
_____

AIKEN, District Judge:

     Plaintiff Thomas Frederick Brower, a former inmate at Eastern Oregon
Correctional Institute, brings this 42 U.S.C. § 1983 action against defendants Lt.
William Powell and Lt. Jason Duchek, corrections officers with the Oregon
Department of Corrections ("ODOC"), and ten unidentified ODOC employees.
Plaintiff alleges that defendants failed to protect him from gang retaliation in
violation of the Eighth Amendment. Now before the Court is defendants' Motion for
Summary Judgment (doc 41). For the reasons discussed below, defendants' motion
is DENIED.

## BACKGROUND

Plaintiff is a former ODOC inmate who was confined at the Eastern Oregon Correctional Institution (EOCI), a medium security facility in Pendleton, Oregon, from March 3, 2015 until February 4, 2016. Housing History Brower Decl. Ex. 1 (doc. 49). On March 5, 2015 plaintiff was assaulted by another inmate. He alleges that the assault occurred because defendants, with deliberate indifference, placed him on the gang side of EOCI knowing he was at risk of gang violence there.

Plaintiff was first incarcerated in 2002 and shortly thereafter joined the Irish Pride, a white supremacist prison gang. After rising to a leadership position within the gang, plaintiff decided he wanted out. He made a deal to provide information to assist the Oregon State Police in a prison racketeering investigation. As part of that deal, ODOC agreed to help plaintiff "escape the influence of Irish Pride[.]" Brower Dep. 68:13–16 (doc. 49). Plaintiff stayed in protective custody until he was transferred to a Florida prison under an interstate compact agreement. He later returned to Oregon where he was transferred to a series of minimum and medium security prisons.

But plaintiff's gang history followed him and is documented in his prison record. In September 2013, after plaintiff was transferred from the minimum to the medium side of the Snake River Correctional Institution ("SRCI") for misconduct, he was assaulted by an Irish Pride member. Assault Report, Brower Dep. Ex. 4 (doc. 49). The prison staff completed an assault report documenting plaintiff's Irish Pride conflict and entered it as "STM Intel" in ODOC's Offender Management System

("OMS"). STM Report in OMS, Brower Dep. Ex. 5 (doc. 49). After the assault, plaintiff was moved to the minimum side of the facility where he resided without further incident.

On December 31, 2014, after another disciplinary infraction, plaintiff was transferred to the Oregon State Penitentiary ("OSP") and placed in disciplinary segregation. After completing his disciplinary segregation, plaintiff requested continued administrative segregation ("ad seg")—housing separate from the general prison population—for fear of Irish Pride retaliation, which is documented in his February 10, 2015 ad seg request. Plaintiff's request included the following note:

> Reason for placement: Inmate was interviewed while housed in [disciplinary segregation unit]. Inmate Brower was housed at OSP in 2006, 07 and 08. He claims to have been a shot caller for . . . Irish Pride but dropped out towards the end of 2008. Because of his past history and prior Ad-seg packet [i]t is believed that if released to general population that he would be marked for assault. Request to be transferred to a more suitable facility.

Request for Administrative Housing, Brower Decl. Ex. 6 at 2 (doc. 49). Instead of granting plaintiff's ad seg request, ODOC transferred plaintiff from OSP to the general population at EOCI. That decision was made at a February 24, 2015 meeting of the statewide Special Population Management ("SPM") committee.

Upon plaintiff's arrival at EOCI, the housing department assigned him to housing on the westside of EOCI, where plaintiff asserts "active" gang members are housed, and, two days later, he was "assaulted by an inmate at the behest of Irish Pride in the dining hall." First Amend. Compl. ¶ 13 (doc. 32); Brower Dep. 134:5–10; 136:3–5 (doc. 49). After the assault, plaintiff was transferred to the eastside of EOCI,

which plaintiff asserts houses only non-active gang members and other inmates "who cannot be safely housed with other general population." Brower Dep. 136:15–19 (doc. 49). He resided there without incident until he left EOCI almost a year later.

## STANDARD OF REVIEW

Summary judgment is appropriate if the moving party shows that there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The materiality of a fact is determined by the substantive law on the relevant issue, while the authenticity of a dispute is determined by inquiring whether a reasonable jury could return a verdict for the nonmoving party in light of the evidence presented. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir. 1987). A dispute of material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See Cortez v. Skol,* 776 F.3d 1046, 1050 (9th Cir. 2015) (citing *Thomas v. Ponder,* 611 F.3d 1144, 1150 (9th Cir. 2010)).

The moving party has the burden of establishing the absence of such genuine issues of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Celotex,* 477 U.S. at 324; Fed. R. Civ. P. 56(e). "Summary judgment is inappropriate if reasonable jurors, drawing all inferences in favor of the nonmoving party, could return a verdict in the nonmoving party's favor. *Diaz v. Eagle Produce*

*Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir. 2008). Any doubt about the existence of a genuine issue of material fact should be resolved against the moving party. *Tauscher v. Phx. Bd. of Realtors, Inc.*, 931 F.3d 959, 962 (9th Cir. 2019).

## DISCUSSION

Plaintiff brings a § 1983 claim for the violation of his rights under the Eighth Amendment to the United States Constitution. Specifically, plaintiff alleges that defendants were deliberately indifferent to plaintiff's safety and failed to protect him from harm when they assigned him to housing on the active gang side of EOCI. Defendants move for summary judgment on qualified immunity grounds. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To prevail on qualified immunity at summary judgment, defendants must show that there is no dispute of material fact as to the alleged constitutional violation or, in the case of a disputed violation, that the right claimed by the plaintiff is not clearly established. If there were a constitutional violation, a government official may nonetheless be entitled to qualified immunity if the right violated was not clearly established at the time of the incident. *Pearson*, 555 U.S. at 232.

## I.    *Eighth Amendment Right*

The Eighth Amendment imposes an affirmative duty on prison officials "to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*,

511 U.S. 825, 833 (1994) (internal quotation marks omitted).  *See also id*. at 852 (Blackmun, J., concurring) ("[T]he Court's opinion . . . sends a clear message to prison officials that their affirmative duty under the Constitution to provide for the safety of inmates is not to be taken lightly.").  "Being violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society." *Id*. at 834 (internal quotation marks omitted).

"[A] prison official violates an inmate's Eighth Amendment right only if that official is 'deliberately indifferent'—in other words, if the official is subjectively aware of a substantial risk of serious harm to an inmate and disregards that risk by failing to respond reasonably." *Wilk v. Neven*, 956 F.3d 1143, 1147 (9th Cir. 2020) (citing *Farmer,* 511 U.S. at 837) (internal quotation marks omitted).  "It is well settled that deliberate indifference occurs when an official acted or *failed to act* despite his knowledge of a substantial risk of serious harm." *Clem v. Lomeli*, 566 F.3d 1177, 1181 (9th Cir. 2009) (citing *Solis v. County of Los Angeles*, 514 F.3d 946, 957 (9th Cir. 2008) (emphasis in *Clem*) (internal quotation marks and brackets omitted).  "But an official's failure the to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot . . . be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 838.

"A fact-finder may infer subjective awareness from circumstantial evidence." *Wilk*, 956 F.3d at 1147.  And "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842.  Further, "an official [may not] escape liability by showing that he knew of the

risk but did not think the complainant was especially likely to be assaulted by the prisoner who committed the act." *Id*. at 826.

Defendants argue that plaintiff cannot establish an Eighth Amendment violation because neither defendant perceived any risk of harm to plaintiff through his housing in the general population at EOCI. I first evaluate whether there is sufficient evidence in the record for a reasonable jury to find that defendants were aware of a substantial risk of serious harm to plaintiff and, if so, whether a jury could find that they disregarded that risk by failing to take reasonable mitigating measures.

### A.    *Lieutenant Powell*

When plaintiff was transferred to EOCI in 2015, Lt. Powell was a Security Threat Management ("STM") lieutenant at ODOC institutions. He states that STM has "three primary functions: high alert inmate management, department-wide intelligence gathering, and investigative support to superintendents during major incidents." Powell Decl. ¶ 5 (doc. 43); *See* OAR 291-069-0200(3)(a)(A)–(C) (2018).[1] Lt. Powell worked mainly out of EOCI. Lt. Powell's job was to "review and investigate suspected security threat activity; maintain and gather intelligence on security threat groups ["STGs" or gangs], inmates and their affiliates[,]" and to "serve as liaison between the department . . . and correctional institutions[.]" OAR 291-069-0210(8) (2018), Powell Decl. Ex. 1, at 2. He was tasked with ensuring the safety of

---

[1] OAR 291-069-0200 through 291-069-0280 have not been amended since 2008 and are currently in force. Lt. Powell attached a 2018 copy of these OARs to his declaration.

inmates including safety from high-risk STG inmates.  In that capacity, he consulted on housing assignments for "high alert" inmates.

Plaintiff was not in Lt. Powell's "high alert" or STM caseload.  The "high alert" criteria and the role that gang affiliation plays in designating an inmate "high alert" are not entirely clear.[2]  However, in his deposition, Lt. Powell explained that, in 2007 ODOC stopped classifying inmates by threat group (that is, by gang membership) and began to focus on threat or risk level.

Lt. Powell attended the February 2015 SPM committee meeting during which plaintiff's transfer to EOCI was approved.  Lt. Powell states that he does not remember the meeting, but that he would have had input into the committee's decision even though he would not have had final say in that decision.  Lt. Powell asserts that he did not perceive a risk of harm to plaintiff because plaintiff "was successfully housed in general population at SCI prior to his misconduct, and there was no reason to believe that [plaintiff] faced a greater risk of harm at EOCI than in general population at any other facility."

Lt. Powell asserts he had no prior knowledge of a substantial risk of harm to plaintiff, but there is circumstantial evidence in the record from which a jury could infer knowledge.  Lt. Powell was charged with managing security threats at ODOC institutions and with keeping inmates safe.  In his deposition, Lt. Powell

---

[2] In his deposition, Lt. Powell explained:  "If an inmate is found guilty of at least one of several serious conduct violations, the department can designate the inmate as high alert and place him on an STM caseload.  The department can also designate an inmate as high alert if he is an interstate transfer to Oregon; has been identified as sexually aggressive; has engaged in an inappropriate inmate/staff relationship; or has displayed other high risk behavior."  Powell Decl. ¶ 8 (doc. 43).

acknowledged that "[Irish Pride] is a documented security threat group within the [DOC]," and that, in his work as EOCI STM manager, a gang affiliation of an incoming inmate "c[ould] come to [his] attention." Powell Dep. 49:3–4; 54:1–8 (doc. 49). Specifically, he could access STM and OMS reports, like the report entered after plaintiff's 2013 assault at SRCI, through ODOC's statewide database. Lt. Powell also has access to inmates' ad seg requests and views ad seg documents in assisting with housing assignments.

Further, although Lt. Powell does not remember the details of the discussion at the SPM committee meeting, records from that meeting suggest that plaintiff's housing history and his history with Irish Pride were part of the discussion. The decision tracking form from that SPM committee meeting contains plaintiff's housing history since his 2012 return to Oregon, his 2015 OSP ad seg request citing plaintiff's fear of gang reprisal, and the 2013 SRCI gang assault report. Jones Decl. Ex. 1–6 (doc. 44). The minutes from that meeting note plaintiff's OSP ad seg status. Powell Decl. ¶ 18. Lt. Powell also explained that "it is common for SPM to place inmates in a different institution when they are having issues with [a gang]." *Id.* at¶ 20. Lt. Powell also acknowledged that "there were active members in the STG group Irish Pride during [that] time." *Id.* at ¶ 21. Although Lt. Powell asserts that, because plaintiff was successfully housed at SCI, he had no reason to believe that plaintiff faced a greater risk of harm at EOCI, there is evidence in the record from which a jury could reach a different conclusion. SCI is a minimum-security facility, not a medium facility like EOCI. As plaintiff explained in his deposition, "[a]ll of the

medium and maximum institutions have gang members[,]" including Irish Pride members, minimum institutions do not have active gang members.  Brower Dep. 72:11–16 (doc. 49).

Based on the evidence regarding Lt. Powell's role and access to information about plaintiff, both through ODOC's database and from the SPM committee meeting, a jury could infer that Lt. Powell knew of plaintiff's history with Irish Pride and the threat that active members of Irish Pride posed to plaintiff at EOCI. Although Lt. Powell states that "[he] was not particularly concerned with Irish Pride members" at EOCI, he does not offer any explanation for why that was the case. Powell Decl. ¶ 21 (doc. 43).  Thus, whether Lt. Powell had actual knowledge of a substantial risk to plaintiff depends on a credibility determination not appropriate for resolution at summary judgment.

I next evaluate whether there is sufficient evidence for a jury to find that Lt. Powell disregarded the risk of harm to plaintiff by failing to respond reasonably to that risk.  "Once an official is subjectively aware of a substantial risk of serious harm, clearly established law requires only that the official take reasonable measures to mitigate the substantial risk." *Wilk*, 956 F.3d at 1148–49 (internal quotation marks and brackets omitted).  Lt. Powell asserts that he only had input, not final say, in the SPM committee decision to transfer plaintiff to EOCI, a medium security prison.  He implies that no other reasonable mitigating measures were available to him.  Plaintiff asserts that even after he had been transferred to EOCI, defendants could have placed him in ad seg or on the eastside—the side that plaintiff alleges is the inactive

gang side of EOCI. The record demonstrates that, in his capacity as Security Threat Management Lieutenant, Lt. Powell had the ability to influence plaintiff's housing assignment by consulting with the EOCI housing staff.

Although Lt. Powell testified that plaintiff was not on his STM caseload, a jury could infer that he had a close, regular working relationship with the housing department at EOCI, where he was primarily based. That, combined with evidence of Lt. Powell's knowledge of the risk that Irish Pride members posed to plaintiff, the presence of active Irish Pride members at EOCI, and plaintiff's testimony that the westside of EOCI housed active gang members and the eastside did not could lead a reasonable jury to find that Lt. Powell disregarded the Irish Pride threat to plaintiff by failing to alert housing staff to that risk. Thus, plaintiff raises a genuine issue of material fact as to whether Lt. Powell disregarded the risk of harm to plaintiff. Accordingly, Lt. Powell is not entitled to a ruling, as a matter of law, that he did not violate plaintiff's rights.

### B. *Lieutenant Ducheck*

When plaintiff was transferred to EOCI in 2015, Lt. Duchek was in charge of housing assignments at EOCI. He assigned inmates to either east or westside housing, and he could also request ad seg housing if needed. Lt. Duncheck emphasized that placing inmates in ad seg "is not in the interest of ODOC or the inmate . . . if it can be avoided." Duchek Decl. ¶ 26 (doc 42). In making housing assignments, Lt. Duncheck's "[s]taff use information on ODOC computer systems[.]" *Id.* at ¶ 10. Specifically, staff first review "verified conflicts." *Id.* at ¶ 12. Staff then review a

variety of information including an inmate's age, remaining sentence, "disciplinary history," "current segregation time," and a review of the 1206 transfer form—a form that documents SPM approval of inmate transfer between institutions. *Id.* at ¶¶ 10–12.

Lt. Ducheck approved plaintiff's housing assignment to the westside of EOCI but states that "there was no reason to conclude that [plaintiff's] housing assignment placed him at risk of harm." *Id.* at ¶ 18. Lt. Duchek "reviewed [plaintiff's] housing history," and followed his "little routine of going through and evaluating the inmate who is arriving and their needs." Duchek Dep. 35:1–3 (doc 49). He states that plaintiff's gang history, prior out-of-state placement, and plaintiff's OSP ad seg history "were not considered at the time of his housing assignment[.]" Ducheck Decl. ¶ 19 (doc 42).

Although Lt. Ducheck asserts that he had no prior knowledge of a substantial risk of harm to plaintiff, there is circumstantial evidence in the record from which a jury could infer knowledge. The housing staff was most concerned with an inmate's potential for conflict with other inmates and the staff routinely reviewed an inmate's disciplinary history, "current segregation time," and the 1206 transfer form. And Ducheck personally reviewed plaintiff's housing history.

Plaintiff's 1206 transfer form prominently displays: "***AD-HOLD TO GP***." 1206 Administrative Transfer Request, Ducheck Decl. Ex. 2. In other words, the form warns that plaintiff is being transferred from ad seg housing to the general population at EOCI, which would alert staff to investigate the reason for plaintiff's

ad seg housing and uncover his OSP ad seg request.  Further, a routine investigation of plaintiff's current segregation time and disciplinary history would also reveal plaintiff's OSP ad seg request.

Based on this evidence regarding information the housing staff routinely used to determine whether an inmate might have a conflict with another inmate—particularly the 1206 transfer form and the segregation and disciplinary histories—together with Lt. Duchek's role and his statement that he personally reviewed plaintiff's housing history, a jury could infer that Lt. Duchek had knowledge of plaintiff's OSP ad seg request, plaintiff's history with Irish Pride, and the threat that active Irish Pride members at EOCI posed to plaintiff.  Thus whether Lt. Duchek had actual knowledge of a substantial risk to plaintiff depends on a credibility determination not appropriate for resolution at summary judgment.

I next evaluate whether there is sufficient evidence for a jury to find that Lt. Duchek disregarded the risk of harm to plaintiff by failing to respond reasonably to that risk.  Lt Duchek asserts that placing plaintiff on the westside was reasonable because "it is not possible to separate inmates on the eastside and westside of the institution." Ducheck Decl. ¶ 25.  He states that "[c]ontrary to [plaintiff's] assertions, there is no 'minimum' facility at EOCI[,]" although "[t]here are differences between the two sides" and because the eastside is "primarily . . . dormitory units," the eastside may have "the feel of a minimum institution." *Id*. at ¶ 7.  But he also states that the inmates are not completely separated and can travel back and forth. *Id*. at ¶ 8.  He does not state whether there is a designated or de facto active gang side.

Page 13—OPINION AND ORDER

Given plaintiff's unrebutted testimony that the westside of EOCI housed active gang members and the eastside did not and given that, after the assault, plaintiff was moved to the eastside and resided there for almost a year without incident before leaving EOCI, a reasonable jury could find that, despite the ability to pass between the sides, there was a difference between the two sides that would have mitigated the threat to plaintiff and that Lt. Duchek disregarded the Irish Pride threat to plaintiff by assigning him to the westside of EOCI.  Thus, plaintiff raises a genuine issue of material fact as to whether Lt. Duchek disregarded the risk of harm to plaintiff. Accordingly, like Lt. Powell, Lt. Duchek is not entitled to a ruling, as a matter of law, that he did not violate plaintiff's rights

## II.   *Qualified Immunity*

Defendants assert that they are entitled to qualified immunity.  Qualified immunity protects government officials from liability for civil damages "unless the official's conduct violated a clearly established constitutional right." *Pearson*, 555 U.S. at 232.  To be clearly established, "[t]he contours of the right must be sufficiently clear" at the time of the incident "that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Thus, a defendant must have "fair and clear warning" that the alleged conduct was unconstitutional.  *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). But "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Id*. at 741.

The Ninth Circuit recently emphasized that in failure to protect cases, plaintiff need not point to caselaw that traces the precise circumstances of the case at hand to show that defendants violated clearly established law. "'The Supreme Court need not catalogue every way in which one inmate can harm another for [courts] to conclude that a reasonable official would understand that his actions violated [the Eighth Amendment].'" *Wilk*, 956 F.3d at 1148 (quoting *Castro v. County of Los Angeles*, 833 F.3d 1060, 1067 (9th Cir. 2016)) (second brackets in *Wilk*). Instead, "[o]nce an official is subjectively aware of a substantial risk of serious harm, clearly established law requires only that the official take reasonable measures to mitigate the substantial risk." *Id.* (internal quotation marks and brackets omitted).

Further, the case law is replete with prison gang violence sufficient to put defendants on notice that they have a duty to protect inmates who are at risk of such violence. *See, e.g.*, *Fierro v. Smith*, 731 Fed. App'x 652, 655 (9th Cir. 2018) (relying on *Farmer* to conclude that "the law requiring prison officials to take reasonable measures to abate an inmate's substantial risk of serious harm from other inmates clearly was established when" the plaintiff made his protective custody requests between 2011 and 2013); *Luna v. Thurien*, 129 Fed. App'x 381, 383 (9th Cir. 2005) (relying on *Farmer* as clearly established law to affirm denial of qualified immunity for sheriff's officers who exposed the plaintiff to rival gang members resulting in the plaintiff's assault by those gang members); *Robinson v. Prunty*, 249 F.3d 862, 866–67 (9th Cir. 2001) (relying on *Farmer* as clearly established law to affirm denial of qualified immunity for prison officials who operated racially integrated exercise yards

exposing inmates of race-based gangs to assault by rival gang members, which resulted in the plaintiff's assault by a rival gang member).

Defendants assert that the case at hand does not fall squarely within clearly established precedent because that precedent "involve[s] a specific risk of harm from a particular inmate[.]" Ds. Reply in Supp. of Mot. Summ. J. 2–3 (doc. 50). Defendants seek to distinguish a threat posed by a particular person in the prison population from a threat posed by unnamed persons in the general prison population. But defendants cite no case law in which the Supreme Court or the Ninth Circuit make such a distinction. In the controlling case, *Farmer*, 522 U.S. at 829–30, plaintiff, a transgender person, alleged a risk of harm from being placed in the general prison population. Thus, the duty to protect caselaw does not distinguish between a threat from a particular person and a more generalized threat from unnamed persons in the prison population.

Here, plaintiff's prison tenure from 2008 onward is marked by fear of reprisal from Irish Pride, movement in and out of protective ad seg housing, and an earlier assault by an Irish Pride member in a medium security prison, all of which are well-documented in his institutional record. Prison officials' failure to protect an inmate from gang violence violates a clearly established constitutional right. Accordingly, defendants' qualified immunity argument fails.

//

//

//

Page 16—OPINION AND ORDER

## CONCLUSION

For the reasons set forth above, defendants' Motion for Summary Judgment (doc. 41) is DENIED.

IT IS SO ORDERED.

Dated this  29th  day of May 2020.


_____
/s/Ann Aiken
Ann Aiken
United States District Judge